**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

Global Enterprises & Holdings, Inc

**Plaintiff,**

V.

Case No.: 2:25cv08712-MEMF-(RAOx)

Paramount Pictures Corporation ("Paramount"),

Tyler Perry, individually ("Perry"),

Tyler Perry Studios, LLC ("Tyler Perry Studios"),

Black Entertainment Television LLC ("BET"),

Harpo Productions, Inc. ("Harpo"),

Oprah Winfrey Network ("OWN") ,

Warner Brother Studios ("WBS"),

Netflix, Inc. ("Netflix"), and

DOES 1–50 (collectively, "Defendants"),

**Defendant.**

_____

**COMPLAINT FOR COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. § 501, BREACH OF IMPLIED-IN-FACT CONTRACT, BREACH OF CONFIDENCE AND UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE § 17200; DEMAND FOR JURY TRIAL**

1

Plaintiff Global Enterprises & Holdings, Inc. ("Plaintiff") moves this court with a complaint for copyright infringement; Other counts and Demands for Jury Trial against Defendant Paramount Pictures Corporation ("Paramount"), Tyler Perry, Individually ("Perry"), Tyler Perry Studios, LLC ("Tyler Perry Studios"), Black Entertainment Television LLC ("BET"), Harpo Productions, Inc. ("Harpo"), Oprah Winfrey Network ("OWN"), Warner Brother Studios ("WBS"), Netflix, Inc. ("Netflix"), and DOES 1–50 (collectively, "Defendants") as follows:

## I.   PARTIES

1.      Plaintiff, Global Enterprises & Holdings Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Miami, Florida. Owns the copyrights of the Work "The Senator's Wife" and "Memoirs of The Senator's Wife."

2.      Defendant Paramount Pictures Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Los Angeles, California. BET is a subsidiary and airs the alleged Infringing Works "The Oval" and "Ruthless."

3.      Defendant Tyler Perry is an individual residing in the State of Georgia. Does business in this District of California. Perry produced the alleged Infringing Works.

4.      Defendant Tyler Perry Studios, LLC is a limited liability company organized under the laws of the State of Georgia, with its principal place of business in Atlanta, Georgia. Does business in the Central District of California. The Studio produced the alleged infringing Work.

5.      Defendant Black Entertainment Television, LLC (d/b/a BET Networks) is a limited liability company organized under the laws of the State of Delaware, with its principal

2

place of business in New York, New York. Does business in the Central District of California. The Network airs the alleged Infringing Work, "The Oval" and "Ruthless."

6.  Defendant Oprah Winfrey Network, LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Los Angeles, California. OWN is a joint venture of Harpo and WBS. Allegedly provided a contract to Plaintiff and distributed the Work to Tyler Perry.

7.  Defendant Harpo Productions, Inc. is a corporation organized under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois. Does business in the Central District of California. OWN is a joint venture of Harpo.

8.  Defendant Warner Brothers Studios is believed to be a division or entity of Warner Bros. Entertainment Inc., a corporation organized under the laws of the State of Delaware, with its principal place of business in Burbank, California. OWN is a joint venture of WBS.

9.  Defendant Netflix, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Los Gatos, California. Netflix airs the alleged infringing work "A Jazzman's Blues."

10.  The true names and capacities of DOES 1–50 are presently unknown. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

## II.  JURISDICTION

11.  This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338 because this action arises under the Copyright Act, 17 U.S.C. § 101 et seq., and includes related state-law claims within the Court's supplemental jurisdiction under 28 U.S.C. § 1367.

12.  Venue is proper in the Central District of California under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this

3

District. In addition, Defendants transact business and are subject to personal jurisdiction in this District, making venue proper here.

13. Paramount maintains its studio lot and principal operations in Los Angeles, California; BET maintains significant operations in Los Angeles; Netflix operates production and distribution facilities in Los Angeles; Harpo and/or its related network OWN conduct business in Los Angeles; and Tyler Perry Studios conducts business in this District through production and distribution partnerships with the foregoing entities.

14. A substantial portion of the disclosure, review, development, and distribution of the infringing content occurred in Los Angeles, California, including communications by an industry colleague located in this District who represented that Plaintiff's Work would be shared with her team for consideration.

## III.    ALLEGATIONS

15. Plaintiff respectfully submits that it published the Work of Mrs. S. M. Ford (the "Author"), including distinctive plot, characters, sequence of events, and expressive elements that constitute protectable expression under the Copyright Act. "The Senators Wife" TV show treatment based on the novel "Memoirs of the Senators Wife" both have registered copyrights. "Memoirs of the Senator's Wife" is an award-winning best-selling novel available on Amazon and is well publicized.

16. Upon information and belief, Carla G., Senior Vice President at Harpo Productions and later Executive Vice President of Programming and Development at OWN, was responsible for reviewing creative submissions and approving programming for broadcast on OWN. Plaintiff alleges that Carla G. and her department had access to Plaintiff's Work during the development period preceding the release of the infringing program.

4

17. Plaintiff through Mrs. Ford disclosed the Work to Carla G., at a Sundance networking event for disadvantaged artists, in February 2019, as evidenced by a photo. Interested in Mrs. Ford's very unique storyline pitch Carla G. requested Mrs. Ford email her the treatment. At Carla G.'s request, Mrs. Ford emailed the treatment with the understanding that if used payment would be made. Carla G. forwarded Mrs. Ford to her creative executive, Ashley W., who sent Mrs. Ford an unethical, predatory and unconscionable contract, which Mrs. Ford refused to sign.

18. The contract stated that the Work could be shared and exploited by OWN/ Harpo and their affiliate companies for free, and Plaintiff never agreed to the unconscionable, exploitive and unethical contract and refused to sign. However, Ms. Whitker accepted the submission of the treatment without Mrs. Ford's signature, through her entertainment lawyer. The lawyer stated in email for production "consideration" which is customary industry practice of expected payment for use and Ashley W. stated she would share the Work with her team for review. Plaintiff through Mrs. Ford and her attorney expressly conditioned any use on compensation and credit.

19. Plaintiff through Mrs. Ford provided the Work under an expectation—communicated and understood—that if Defendants or their partners or affiliates used the Work, they would compensate Plaintiff. See Desny v. Wilder, 46 Cal.2d 715 (1956) (recognizing implied-in-fact contract when a writer submits material with the expectation of payment upon use, including story pitches and treatments).

20. Upon information and belief, Defendants received, reviewed, and used the Work to develop, produce, and distribute two ongoing television series and a film incorporating Plaintiff's protectable expression without authorization or compensation, resulting in

approximately 200 episodes and 1 film. The film "Jazzman's Blues" characters, plot and unique storylines are similar to the Work, in that a light skinned Black mother and daughter pass as White. The mother runs away to start a new life as a White woman, then the daughter marries a racist white politician to better their condition, passing as white. The daughter has a son with questionable parentage. The daughter has a secret affair with a Black man. The racist husband wants revenge against the Black lover. The Black lover dies. Family secrets of Black heritage are revealed via a letter. The child in both shows does not know their identity, or heritage is Black, and it is revealed.

21.    The series the "Oval" in which a Black secret service agent has a forbidden affair with a politician's wife, and the spin off series "Ruthless" involving a religious sex cult, and a cult that the son of the politician lives with is a substantially similar and unique enough plots and storylines that when Mrs. Ford now tries to pitch her once unique, original and interesting storylines, a producer in February 2025 stated, "Have you seen the Oval?" At which time the Plaintiff investigated and found there was a pattern of Tyler Perry, who had a partnership or affiliation with Harpo/ OWN (Oprah Winfrey Network), using her Work without compensation by incorporating her unique storylines and characters and her Work into his own commonplace storylines. Other disadvantaged artists alleged some of the Defendants had a similar pattern of use or incorporation of their work without compensation.

22.    For examples sources including Hollywood Reporter stated that "A Jazzman's Blues" script was originally about a Black man leaving home in search of fame then returning to his rural hometown to rescue his ex-girlfriend from an abusive grandfather. Originally "A Jazzman's Blues" had an ordinary storyline that was probably difficult to get final approval

for production. Upon investigation in February 2025 Plaintiff noted that now after Plaintiffs treatment and novel were submitted to Defendants, "A Jazzman's Blues" now has almost verbatim the same unique storyline and characters as "Memoirs of the Senator's wife." Which is about a mother and daughter leaving behind their hometown to pass for White in a new town and the daughter marrying a racist White man, to better their condition and now they have political connections. The child does not know their Black heritage; Secrets are revealed via a letter. And the passing daughter has a secret affair with her Black protector who dies.

23.    Defendants appear to have illogically incorporated the unique storyline of "The Memoirs of the Senators Wife" into "A Jazzman's Blues" because no one Black would try to pass for White in in the 1950's in their rural hometown or stay in a town where people know they are Black, because of the life-threatening danger of being discovered by racists.  So, incorporating Plaintiff's unique storyline into "A Jazzman's Blues" did not make sense but allegedly it was done without Plaintiff's payment, knowledge or moral consent. Plaintiff believes the story of "A Jazzman's Blues" was changed to the unique storyline of "The Senator's Wife" and "Memoirs's of the Senator's Wife" to make Defendant's ordinary production more sellable.

24.    **Intentional Omission and Concealment**: Carla G. Harpo Vice President who appeared very interested in Plaintiff's unique work referred her to Harpo's creative director. In April 2019 Harpo's Creative Director reviewed Plaintiff's attorney submitted for "consideration" material, over a period of several weeks. Then ultimately advised Plaintiff, via email in Exhibit B that OWN was not currently interested, stating that OWN had other similar projects in the works. Plaintiff responded in surprise since it was established that Harpo

7

was interested in her work because it was a unique storyline so found it strange and concerning that suddenly the creative director after several weeks with the material said there was similar productions in the works. Logically it did not make sense that the Vice President and Creative director did not know from the start that they had similar productions to the unique pitch, so should not have sent a contract if they were working on similar productions or reviewed the material for weeks. Plaintiff subsequently searched OWN's and Harpo Productions' publicly available development slates and could locate no projects similar to Plaintiff's work, suggesting that Defendants concealed the existence of the similar projects until its public release, but Plaintiff never found similar productions released on OWN. Oprah Winfrey Network, LLC, including producing scripted television series such as The Haves and the Have Nots (2013–2021), Love Thy Neighbor (2013–2017), and later seasons of For Better or Worse (2013–2017). These productions were publicly promoted as OWN-commissioned Tyler Perry Studios projects, with OWN customarily receiving producer credit and promotional association.

25.    Plaintiff further alleges that the program at issue, which incorporated substantial portions of Plaintiff's submitted material, was instead released on BET and Netflix, without crediting OWN. BET and Netflix are networks with no public corporate affiliation with OWN or Harpo Productions. Plaintiff alleges this was a deliberate deviation from Defendants' established production and distribution pattern and was intended to, and did, conceal Defendants' access to and use of Plaintiff's material and delay Plaintiff's discovery of the infringement.

26.  Upon investigation February 2025 the releases of similar productions were on BET and Netflix that have no publicized affiliation with OWN, so even though diligent Plaintiff would not have investigated these unusual network releases.

27.  Although Plaintiff was copyrighted and was diligently surveying OWN/ Harpo productions for use of the Work, there was no way of knowing Tyler Perry had used Plaintiff's Work, prior to February 2025, on BET and Netflix, as BET and Netflix does not have a known affiliation with OWN.  Plaintiff brings this action within the time permitted by law, including under the delayed discovery rule and/or equitable tolling, because this complaint was filed within two years for contract/confidence claims and three years for copyright infringement of the date, February 2025, Plaintiff first knew or reasonably should have known of the injury. Defendants' intentional omission of OWN's producer credit, deviation in network release, and related acts of concealment tolled the statute of limitations until Plaintiff's discovery.

28.  Three shows, including 2 TV shows and a film are a clear pattern of using Mrs. Ford's interesting and original unique storylines/ plots, character and Work, to spruce up formerly ordinary storylines of the Defendants, without compensation or citing or acknowledging Plaintiff's Work. Public reporting indicates that Paramount entered into a multi-hundred-million-dollar deal with Perry, an individual, for such programming. Plaintiff alleges that Defendants derived significant revenues and profits from the exploitation of the infringing series.

29.  Defendants' series contains substantial similarities to Plaintiff's Work, including unique character relationships, story arcs, and a protectable sequence of events, far beyond

9

unprotectable ideas or scènes à faire. However, per Desny V. Wilder Storyline pitches are also protected under this circumstance.

30. It is respectfully submitted that Plaintiff did not authorize Defendants to use the Work and has never been paid or credited. Plaintiff discovered the infringement recently and acted diligently upon discovery.

31. Plaintiff's investigation revealed that Defendants, particularly Tyler Perry and his affiliated entities, have engaged in a systematic practice of utilizing Plaintiff's original and unique storylines, character constructions, and narrative devices, and those of other authors, to enhance their own productions without compensation or acknowledgment.

32. Plaintiff's allegations of copyright infringement and misappropriation are further supported by the well-documented history of similar conduct by Defendant Tyler Perry and his affiliated entities. Over the past decade, Tyler Perry has repeatedly faced public accusations and legal actions for plagiarism and unauthorized use of others' creative works. These incidents include, but are not limited to, lawsuits and settlements involving the misappropriation of storyline pitches, treatments, and entire scripts from minority and underrepresented creators. Including those who submitted upon his request for submissions on his website.

33. In one notable instance, in 2009, the Estate of gospel songwriter Bertha V. James sued Tyler Perry for allegedly using a verse from her song "When I Think of the Goodness of Jesus" in the film Madea Goes to Jail without authorization. The case was settled out of court under confidential terms, indicating a resolution favorable to the plaintiff.

34. Tyler Perry settled a copyright infringement case with musicians Kofi Nti and Ofori Amponsah in November 2024 after using their song 'Odo Nwom' without permission in a

10

behind-the-scenes video related to a Tyler Perry production. The settlement included undisclosed financial terms, acknowledging the unauthorized use of copyrighted work.

35. Playwright Donna West sued Tyler Perry in 2008, alleging that his play Diary of a Mad Black Woman infringed on her 1991 work Fantasy of a Black Woman. The case is frequently cited as an example of recurring allegations of unauthorized use of creative works.

36. Tyler Perry and his production company were sued by author Terri Donald, who alleged that Perry's film "Good Deeds" was based on her book "Bad Apples can be Good Fruit." Donald claimed she had sent her novel to Perry's company prior to the film's production, and sought damages and acknowledgment for the use of her work. The case drew significant attention to Perry's practices and a pattern of complaints of exploiting the creative output of others without proper credit or compensation.

37. Similarly, Perry and Harpo Productions were named in a federal lawsuit by Parables Entertainment, which alleged that the hit television show "The Have and Have Nots" was derived from the screenplay "Affairs," authored by Vanessa Lynn. Lynn's work, which had been produced as a play and sold on DVD, was allegedly used as the basis for Perry's series without authorization. Highlighting Perry's repeated entanglement in copyright disputes involving the works of minority creators.

38. Most recently, Perry, along with Netflix and actress Terri J. Vaughn, was sued over the Netflix comedy series "She The People." The lawsuit, filed by Aimee Allison, founder of the nonprofit She The People, alleged that the series was based on information and themes from an unfinished documentary about her organization and infringed on the nonprofit's trademark. The complaint detailed direct communications and exchanges of creative

material between Allison and Vaughn and further alleged that Perry's production company attempted to register the "She The People" trademark, which was denied by the U.S. Patent and Trademark Office. This ongoing litigation underscores a persistent pattern of soliciting, receiving, and then exploiting the creative works and pitches of minority and underrepresented creators.

39. The recurrence of these lawsuits and settlements involving Tyler Perry and his affiliated entities is not coincidental, but indicative of a systematic approach to acquiring and commercializing the intellectual property of others, particularly those from disadvantaged backgrounds who have minimal resources to defend themselves against Perry's massive enterprises and powerful connections.

40. Perry's history of direct access to creative works—often through solicitation, contract transmission, and review—followed by the production and distribution of substantially similar content, demonstrates a willful disregard for the rights of original creators and a calculated pattern of infringement.

41. This established pattern and practice of alleged plagiarism and copyright infringement by Tyler Perry and his entities is highly relevant to the present case. It supports a strong inference that Defendants' conduct toward Plaintiff was not isolated, accidental, or the result of independent creation, but rather part of a broader, intentional scheme to exploit the creative output of minority creators for commercial gain. The documented history of prior allegations, lawsuits, and settlements involving similar facts and circumstances bolsters the plausibility of Plaintiff's claims and underscores the willfulness, knowledge, and intent underlying Defendants' actions in this matter.

42.     As to the instant action, this pattern is evidenced by the repeated and nearly identical appearance of Plaintiff's distinctive plots, character archetypes, and unique thematic expressions in Defendants' Productions, as well as industry feedback indicating that Plaintiff's once-unique storylines have been appropriated and commercialized by Defendants, resulting in substantial harm and unjust enrichment to Defendants.

43.     Defendants' conduct was knowing, intentional, and executed with full awareness of Plaintiff's ownership and the protectable nature of the submitted work and storyline pitches.

44.     Defendants did not merely have access—they actively solicited, received, and reviewed Plaintiff's treatment and related materials, transmitted a contract, and circulated the content among their creative teams. Defendants' subsequent productions incorporated Plaintiff's original, concrete, and protectable elements—including specific plot structures, character relationships, narrative devices, and unique motifs—demonstrating deliberate copying and eliminating any possibility of independent creation or coincidence.

45.     The recurrence of these distinctive elements in Defendants' Productions is not the result of inspiration or happenstance, but of intentional appropriation of Plaintiff's unique expression.

46.     Plaintiff did not authorize Defendants to use, reproduce, or exploit the Work or its storyline pitches in any manner. At no time did Plaintiff receive compensation, credit, or acknowledgment for the use of its protected content, despite Defendants' direct and documented access and subsequent use of Plaintiff's original creative choices.

47.     As a direct and proximate result of Defendants' misappropriation and exploitation of Plaintiff's protectable elements, including almost the precise sequence of events, character

13

archetypes, and unique thematic expressions, Plaintiff has suffered significant harm, including the loss of economic opportunities, diminished value of its original work, and reputational injury.

48.     Defendants have been unjustly enriched by their unauthorized use and commercial exploitation of Plaintiff's creative expression, which formed the foundation of their own successful productions.

49.     Plaintiff acted diligently upon discovering the infringement, taking all reasonable steps to protect its rights and seek redress for the harm caused by Defendants' conduct, including the systematic misappropriation of Plaintiff's original, protectable elements.

50.     The facts set forth herein establish a clear and deliberate pattern of infringement, misappropriation, and exploitation of Plaintiff's protected Work and storyline pitches. Defendants' conduct was marked by direct access, actual knowledge, and intentional copying of Plaintiff's unique creative expression, undertaken with the intent to benefit from Plaintiff's originality without compensation or credit, and resulting in substantial harm to Plaintiff.

51.     Plaintiff attaches and incorporates by reference:

    i.     Exhibit A: Unsigned Contract reflecting unethical, exploitive, unjust, predatory terms and conditions and;

    ii.     Exhibit B: Email from Ashley W., Harpo Creative Executive, stating they would review Plaintiff's Work.

## IV.     CLAIMS AND ARGUMENTS

52.     Plaintiff asserts four interrelated causes of action arising from Defendants' unauthorized exploitation of Plaintiff's copyrighted literary work (the "Work") in the film and television

14

projects identified herein (the "Infringing Works"). First, Plaintiff pleads ownership of valid U.S. copyrights and Defendants' copying of protectable expression—establishing infringement through access and substantial similarity, and alleging willfulness.

53.    Second, under California's implied-in-fact submission doctrine (Desny), Plaintiff alleges the Work was disclosed with an understood expectation of payment upon use, Defendants accepted the submission on those terms, and then used the Work without compensation. Third, Defendants' conduct also constitutes unlawful and/or unfair business practices under the Unfair Competition Law (UCL), for which Plaintiff seeks injunctive relief and restitution.

54.    Fourth Defendant's conduct also constitutes Breach of Confidence Accordingly, Plaintiff sets forth the following claims for relief—each pleaded in the alternative and incorporating the foregoing allegations by reference—seeking injunctive relief, impoundment, actual or statutory damages and profits, costs, and attorneys' fees as permitted by law. For compensatory damages in an amount according to proof at trial; For disgorgement of profits attributable to Defendants' unauthorized use; for such other and further relief as the Court deems just and proper.

55.    The facts set forth herein provide overwhelming and incontrovertible evidence that Defendants had actual, substantial, and legally significant access to Plaintiff's work and storyline pitches. This direct access, combined with the documented chain of events and the repeated recurrence of Plaintiff's unique creative elements in Defendants' productions, fully supports Plaintiff's claims for copyright infringement, breach of implied-in-fact contract, unfair competition, and breach of confidence.

## V.    CAUSES OF ACTION

### i.    First claim for relief: Copyright Infringement (17 U.S.C § 501)

56.    It is respectfully submitted that Plaintiff re-alleges the foregoing paragraphs pursuant to Copyright Infringement, 17 U.S.C. § 501. Plaintiff owns valid copyright in the Work's protectable expression. 17 U.S.C. §§ 102, 106. "The Senator's Wife" Copyright number PAU003968645 / 2019-02-19 and "Memoirs of the Senator's Wife" PAU004039162 / 2019-08-29.

57.    Defendants copied, prepared derivative works from, distributed, and publicly performed Plaintiff's Work without authorization, violating 17 U.S.C. § 106.

58.    Defendants' copying is actionable because the infringing works are substantially similar to protectable elements of the Work, not merely to general ideas or stock themes. The Desny v. Wilder also provides protection of storyline pitches. Buchwald v. Paramount Pictures Corp., No. C706083 (Cal. Super. Ct. 1990) (recognizing liability where studio used submitted treatment without compensation).

59.    Ownership of a valid copyright and unauthorized exercise of exclusive rights under 17 U.S.C. § 106 state a claim for infringement. In the Ninth Circuit, substantial similarity turns on protectable expression, not ideas or scènes à faire. Willful infringement supports enhanced statutory damages and fee shifting under 17 U.S.C. §§ 504–505.

60.    Plaintiff is the sole owner of all rights, title, and interest in the original literary work and related treatment entitled "Memoirs of the Senator's Wife," including all storyline pitches, character relationships, plot structures, and expressive elements embodied therein. The Work is registered for copyright protection and constitutes protectable intellectual property under federal law.

16

61. Plaintiff's Work contains distinctive and original creative expression, including unique storylines, character arcs, narrative sequences, and thematic motifs that are not generic or commonplace, but rather reflect Plaintiff's individual authorship and creative choices.

62. These protectable elements include, but are not limited to:

A. Central narrative device involving a Black woman who runs away to pass as White with her daughter intimately connected to political power whose private struggles and romantic entanglements threaten to unravel public reputations and living in fear with a White racist husband to improve her families condition; A forbidden affair between the Black daughter passing as White. The White racist husband wants revenge and is jealous. The child does not know their identity or Black heritage and it is revealed. The Black protector dies. Secrets about the child's heritage are revealed via a secret letter. A Black secret service agent having an affair with the politician's wife. A sex cult and a religious cult the politician's son lives with.

B. A plot structure hinging on the dramatic exposure of secrets of her and her child's true Black heritage, living in fear of her racist white husband and death of her forbidden Black lover as the climax.

C. The presence of nearly identical character archetypes, including a conflicted, ambitious mother and daughter protagonist and a Jazz music loving Black protector from a disadvantaged background serving as, protector, lover and confidante. The constant fear of her racist White husband who has no knowledge that she is really Black and having an affair

17

with a Black man, and having a son of questionable heritage, are functionally identical roles and are substantially similar.

D. Unique thematic expressions and imagery, including the use of jazz music as a recurring motif for freedom and longing, the motif of a secret letter as the device through which secrets of Black heritage are revealed, and distinctive, similar dialogue original to Plaintiff's work.

63. Defendants, having obtained direct and deliberate access to Plaintiff's Work by expressly requesting its submission, receiving the treatment and related materials, and transmitting a contract to Plaintiff to distribute the Work to their affiliates, possessed actual knowledge of the content and scope of Plaintiff's protected expression. Defendants' access was intentional, specific, and facilitated through formal channels, including email correspondence and contractual overtures, and included the review and circulation of Plaintiff's materials among their creative teams. This direct access supports a strong inference of copying and precludes any claim of independent creation.

64. Without authorization, Defendants copied, adapted, and incorporated substantial, concrete, and protectable elements of Plaintiff's Work and storyline pitches into their own Productions, including but not limited to the film "Jazzman's Blues," the television series "The Oval," and its spin-off "Ruthless." These Productions feature not only general concepts, but the precise sequence of events, character relationships, narrative structures, and unique motifs that are original to Plaintiff's creation.

65. The similarities between Plaintiff's Work and Defendants' Productions are extensive and specific, encompassing the same narrative order of dramatic climaxes, functionally

18

identical character roles, and the lifting of unique imagery and similar dialogue. Defendants' Productions are fundamentally derived from Plaintiff's original creative expression, and the recurrence of these distinctive elements in Defendants' Productions demonstrates actionable infringement of Plaintiff's copyright and misappropriation of Plaintiff's storyline pitches, satisfying both the objective comparison of expressive elements and the total concept and feel required for substantial similarity.

66.    Defendants' Productions mirror Plaintiff's original arrangement in the following specific respects:

A. The central narrative device of a Black woman who ran away to pass for White, whose daughter is intimately connected to political power, whose private struggles and romantic entanglements threaten to unravel public reputations. She lives in fear of her racist white husband who she married to better her families situation and her child's heritage is a secret even from self. A woman married to a politician having a secret affair with her Black secret service agent, whose son lives with a secret cult. These storyline arc combinations are very original and unique.

B. A substantially similar sequence of dramatic climaxes hinging on the exposure of secrets, such as blackmail, public scandals, revenge, murder, deaths, secret letter and the discovery of Black heritage, of those who believed they were White, dramatic reveal of son's Black heritage. Story Arcs and characters are substantially similar in which a Black secret service agent has a forbidden affair with a politician's wife. Arcs involving a religious sex cult, and a cult that the son of the politician lives with is a substantially similar and a very unique combination of plot/storyline arcs and characters, that show infringement.

C. The presence of nearly identical character archetypes, including a conflicted, ambitious mother and daughter protagonist and a Jazz music loving Black protector from a disadvantaged background serving as, protector, lover and confidante. The constant fear of her racist White husband who has no knowledge that she is really Black and having an affair with a Black man, and having a son of questionable heritage, are functionally identical roles and are substantially similar.

D. The use of unique thematic motifs, including jazz music as a recurring symbol of freedom and longing, and the motif of a secret letter as the device through which secrets of Black heritage are revealed.

67. Defendants have also appropriated distinctive story arcs, characters, similar dialogue and imagery original to Plaintiff's Work, which appears almost verbatim in their productions. These elements are protectable expressions under copyright law, not just stock scenes or general ideas, and their recurrence in Defendants' works demonstrates copying of Plaintiff's unique creative choices.

68. For examples sources including Hollywood Reporter stated that "A Jazzman's Blues" script was originally about a Black man leaving home in search of fame then returning to his rural hometown to rescue his ex-girlfriend from an abusive grandfather. Originally "A Jazzman's Blues" had an ordinary storyline that was probably difficult to get final approval for production. Upon investigation in February 2025 Plaintiff noted that now after Plaintiffs treatment and novel were submitted to Defendants, "A Jazzman's Blues" now has almost verbatim the same unique storyline and characters as "Memoirs of the Senator's wife." Which is about a mother and daughter leaving behind their hometown to pass for White in a new town and the daughter marrying a racist jealous White man, to better their condition

20

and now they have political connections. the passing daughter has a secret affair with her, behind her White husbands back and the Black protector dies. The child does not know their Black heritage; secret Black heritage is written in a letter. The son does not know the identity of his father.

69. Defendants appear to have illogically incorporated the unique storyline of "The Memoirs of the Senators Wife" into "A Jazzman's Blues" because no one Black would try to pass for White in in the 1950's in their rural hometown or stay in a town where people know they are Black, because of the life-threatening danger of being discovered by racists. So, incorporating Plaintiff's unique storyline into "A Jazzman's Blues" did not make sense but allegedly it was done without Plaintiff's payment, knowledge or moral consent. Plaintiff believes the story of "A Jazzman's Blues" was changed to the unique storyline of "The Senator's Wife" and "Memoirs's of the Senator's Wife "to make Defendant's common place production more sellable.

70. The substantial similarity between the Work and the Productions is further evident both in the objective comparison of expressive elements and in the total concept and feel, satisfying the legal standards for actionable infringement. Defendants' use of these elements, including storyline pitches, constitutes direct and intentional misappropriation of Plaintiff's copyright and creative expression, and their documented access precludes any claim of independent creation or coincidence.

71. At no time did Plaintiff authorize Defendants to use, reproduce, distribute, or publicly perform the work or its storyline pitches. Plaintiff did not receive compensation, credit, or acknowledgment for Defendants' exploitation of its protected content, despite Defendants' direct and deliberate access and subsequent use of Plaintiff's original creative expression.

21

72. Defendants' conduct was willful, knowing, and executed with full awareness of Plaintiff's ownership and the protectable nature of the submitted work and storyline pitches.

73. Defendants' direct, documented access and subsequent use of Plaintiff's unique creative choices—including specific plot structures, character relationships, narrative devices, and distinctive motifs—preclude any claim of independent creation or lack of knowledge, and demonstrate a calculated pattern of infringement.

74. As a direct and proximate result of Defendants' infringement and misappropriation of Plaintiff's protectable elements, Plaintiff has suffered substantial harm, including lost economic opportunities, diminished value of its original work, and reputational injury. Defendants have been unjustly enriched by their unauthorized use and commercial exploitation of Plaintiff's intellectual property, which formed the foundation of their own successful Productions.

75. Plaintiff is the sole owner of all rights, title, and interest in the original literary work, the related treatment, and all storyline pitches, character relationships, plot structures, and expressive elements embodied in "Memoirs of the Senator's Wife." Plaintiff's copyright ownership encompasses every protectable aspect of the work, including the submitted storyline pitches, which are registered and entitled to full protection under the Copyright Act.

76. Defendants' access to Plaintiff's Work, including all storyline pitches and supporting materials, was unequivocal, direct, and legally significant. As a disadvantaged minority woman-owned business, Plaintiff was specifically targeted by Defendants—many of whom hold themselves out as minority-focused or Black-owned entities—for submission of its original literary work and related storyline pitches.

22

77.    Defendants, through their authorized representatives, expressly requested the submission, thereby initiating a documented chain of events that led to the misappropriation, infringement, and exploitation of Plaintiff's protectable creative expression. This conduct is part of a broader pattern of soliciting works from minority creators under false pretenses, then denying compensation and credit, resulting in a disparate impact on Black and minority entrepreneurs, and targeting those with less resources to fight for their intellectual property. Defendants' conduct deprived Plaintiff of the right to make and enforce contracts on equal terms and may constitute actionable violations of copyright and contract law.

78.    The facts set forth herein provide overwhelming and incontrovertible evidence that Defendants had actual, substantial, and legally significant access to Plaintiff's work and storyline pitches. This direct access, combined with the documented chain of events and the repeated recurrence of Plaintiff's unique creative elements in Defendants' productions, fully supports Plaintiff's claims for copyright infringement, breach of implied-in-fact contract, breach of confidence, and unfair competition.

79.    Defendants' conduct has resulted in a pronounced disparate impact and systematic exploitation of minority creators, including Plaintiff, and warrants comprehensive relief under all applicable legal standards.

80.    Accordingly, as a direct and proximate result, Plaintiff has suffered damages and Defendants have been unjustly enriched and realized profits attributable to the infringement. 17 U.S.C. § 504(b).

ii.    **Second claim for relief: Breach of Implied -In- Fact Contract (Cal. Code Civ. Proc. § 339 § 337)**

81.    Plaintiff re-alleges the foregoing paragraphs.

23

82. Under California law, an implied-in-fact contract arises when an idea or material is submitted with the mutual understanding that if the idea is used, the recipient will pay for that use (see Desny v. Wilder, 46 Cal.2d 715 (1956).). Elements include: (a) submission conditioned on payment if used; (b) recipient's knowledge/acceptance of that condition; (c) use; and (d) nonpayment.

83. **Montz v. Pilgrim Films & Television, Inc.**, 649 F.3d 975 (9th Cir. 2011) (en banc) – confirmed that these state-law claims are **not preempted by copyright law** and can be brought in federal court under supplemental jurisdiction.

84. Plaintiff disclosed the Work with the expectation of payment if used; Defendants accepted disclosure under circumstances indicating knowledge of that expectation; and Defendants used the Work without compensating Plaintiff, thereby breaching the implied contract. See also Buchwald v. Paramount Pictures Corp., No. C706083 (Cal. Super. Ct. 1990) (recognizing liability where studio used submitted treatment without compensation).

85. In the Buchwald V. Paramount case the judge called the contract unconscionable and unethical and ruled in favor of the plaintiff. Plaintiff in this complaint is requesting similar equal justice under the law, as Plaintiff was presented with an unconscionable and unethical contract from Defendant's affiliate and not paid.

86. Plaintiff submitted its original Work and unique, protectable storyline pitches to Defendants at Defendants' express and documented request, with a clear and mutual understanding—consistent with established industry standards and practices, and particularly relevant for minority and disadvantaged creators—that any use of the submitted material, including specific plot structures, character relationships, thematic motifs, and storyline pitches, would be conditioned upon compensation and appropriate

credit to Plaintiff. Defendants' solicitation and acceptance of Plaintiff's submission established a direct expectation of payment and acknowledgment for any use of Plaintiff's creative content.

87. Defendants, acting through their authorized representatives, specifically solicited the submission of Plaintiff's Work and storyline pitches, received the treatment and related materials, and transmitted a contract to Plaintiff purporting to set forth terms for the use of the work. The contract presented by Defendants contained unconscionable, unethical, and predatory terms, seeking to exploit Plaintiff's original creative expression—including detailed narrative devices, character archetypes, and storyline pitches—without compensation or acknowledgment.

88. This conduct was not isolated, but part of a broader pattern of targeting minority creators with exploitative submission practices, as further evidenced by Defendants' refusal to negotiate fair terms, provide meaningful recourse, or engage in good faith resolution of Plaintiff's rights.

89. Despite Plaintiff's refusal to execute the contract and rejection of its unconscionable terms, Defendants accepted the submission of the Work and storyline pitches through Plaintiff's entertainment lawyer, in accordance with established industry practice. Defendants confirmed receipt and review of the materials, and indicated that the unique narrative elements and storyline pitches would be shared with their creative team for consideration of potential production.

90. This conduct established not only direct and documented access, but also an implied-in-fact contract obligating Defendants to compensate Plaintiff for any use of the submitted material. Defendants' actions reflect a deliberate disregard for Plaintiff's rights and the

rights of similarly situated minority creators, and form part of a broader pattern of conduct that supports Plaintiff's claims for breach of contract and, as further detailed in the following section, civil rights violations.

91.    Plaintiff's submission was made under an explicit expectation—grounded in industry custom and protected by federal law, including civil rights statutes—that Plaintiff would receive payment and credit if Defendants used the work or any of its storyline pitches, including the specific, original elements described herein.

92.    As a minority creator, Plaintiff was entitled to equal treatment and opportunity in the making and enforcement of contracts. Defendants' acceptance of the submission, coupled with their review and subsequent use of the work's distinctive plot structure, character relationships, and thematic motifs, established an implied-in-fact contract obligating Defendants to compensate Plaintiff for any use of the submitted material and to honor Plaintiff's rights to fair and equal participation in the industry.

93.    Defendants knowingly, intentionally, and systematically used substantial, concrete, and protectable elements of Plaintiff's Work and storyline pitches—including the central narrative device, dramatic climaxes hinging on the exposure of secrets, unique character archetypes, and recurring motifs such as jazz music and a secret letter—in the development, production, and distribution of multiple television series and a feature film, including "Jazzman's Blues," "The Oval," and "Ruthless."

94.    This conduct was not isolated, but part of a broader pattern of targeting minority creators, soliciting their original works under false pretenses, and then exploiting those works without compensation, credit, or acknowledgment, thereby perpetuating barriers to equal opportunity and participation for Plaintiff and similarly situated creators.

95.     Defendants' conduct in soliciting, accepting, and exploiting Plaintiff's Work and storyline pitches—by incorporating specific, original, and protectable elements into their own productions—constitutes a clear breach of the implied-in-fact contract and a deliberate deprivation of Plaintiff's rights.

96.     As a direct and proximate result of Defendants' breach, Plaintiff has suffered significant harm, including lost profits, diminished value of its original work, reputational injury, and the denial of equal opportunity and participation in the entertainment industry. Defendants have been unjustly enriched by their unauthorized use and exploitation of Plaintiff's unique creative expression and storyline pitches, achieving commercial success and industry recognition through the misappropriation of Plaintiff's protected status and creative contributions.

### iii.     __Third claim for relief__: Unfair Competition and Unlawful Business Practices (Cal. Bus. & Prof. Code § 17200)

97.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

98.     Defendants engaged in unlawful and/or unfair practices by (a) infringing Plaintiff's copyrights and (b) breaching the implied-in-fact submission contract, thereby obtaining a competitive benefit and unjust enrichment at Plaintiff's expense.

99.     Defendants' conduct, as described above, constitutes unlawful and unfair business acts and practices, including but not limited to the systematic misappropriation of Plaintiff's Work and storyline pitches, unjust enrichment, and the deliberate exploitation of minority and disadvantaged creators.

27

100. Defendants' unfair competition is evidenced not only by their direct access to Plaintiff's original, protectable content and calculated appropriation of unique plot structures, character archetypes, and thematic expressions, but also by their use of purported minority-focused or Black-owned entities as a façade to induce submissions from underrepresented creators, including Plaintiff, under false pretenses of partnership and opportunity.

101. Defendants engaged in a recurring and deliberate pattern of soliciting submissions from disadvantaged and minority artists, including Plaintiff, with the intent to misappropriate, reproduce, and commercialize the submitted works without compensation or credit. In Plaintif's opinion they were enriched from allegedly continually using the Works of disadvantaged artist, or they would not have continued the scheme of soliciting submissions for years without payment, as disadvantaged artists have complained.

102. This pattern is demonstrated by the repeated and nearly identical appearance of Plaintiff's original narrative devices, character relationships, and unique motifs in Defendants' Productions. Defendants' conduct was not isolated, but part of a broader scheme that disproportionately targets minority creators and deprives them of equal economic opportunity and participation in the entertainment industry.

103. Defendants' actions were calculated to deprive Plaintiff and similarly situated minority and disadvantaged creators of the economic, reputational, and contractual benefits of their original works, while unjustly enriching Defendants and their affiliates through the unauthorized exploitation of specific, protectable storylines, character constructions, and creative expression.

104. The recurrence of Plaintiff's unique elements in Defendants' Productions demonstrates a deliberate and systemic strategy to appropriate original intellectual property for

commercial gain, perpetuate barriers to equal participation, and cause a disparate impact on Black and minority entrepreneurs. These practices are part of a targeted and discriminatory pattern that has resulted in substantial harm to Plaintiff and similarly situated minority creators.

105. Plaintiff seeks restitution of monies wrongfully obtained and injunctive relief enjoining further use of the Work under § 17200 et seq.

### iv.    <u>Fourth Claim for Relief:</u> Breach of Confidence (Cal. Code Civ. Proc. § 339 § 3426.6)

106. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

107. A confidential relationship existed between Plaintiff and Defendants by virtue of Plaintiff's submission of the work under circumstances that created a duty of confidence. Author's Lawyer submitted treatment for consideration/ payment if used, submission was accepted and reviewed by Defendant.  Defendants breached that duty by disclosing, using, or exploiting Plaintiff's Work through affiliates without payment which falls under Breach of confidence (Cal. Code Civ. Proc. § 339 Cal. Civ. Code § 3426.6).

108. OWN/Harpo disclosed the Work to their affiliate(s), allegedly including Tyler Perry and Tyler Perry Studios, and Defendants thereafter used the Work (and material derived from it) in the Infringing Works without, permission, or compensation, thereby breaching their duty of confidence to Plaintiff.

109. As a direct and proximate result, Plaintiff has suffered harm, including loss of the reasonable value of the confidential submission, unjust enrichment to Defendants, and other damages to be proven at trial. Plaintiff seeks injunctive relief preventing further

disclosure or use, restitution/disgorgement, and compensatory damages, together with costs and such other relief as the Court deems just and proper.

## VI.    RESERVATION OF RIGHTS

110.    Plaintiff is continuing to investigate facts and third-party materials. Consistent with Fed. R. Civ. P. 15 and Rule 11, Plaintiff expressly reserves the right to seek leave to amend this Complaint to (i) add or substitute parties; (ii) assert additional causes of action supported by facts developed in discovery; and (iii) conform the pleadings to the proof, including adjustment of remedies.

111.    Without limitation, and only if warranted by evidence obtained through disclosures, depositions, and third-party subpoenas, Plaintiff may seek to add claims sounding in fraud/misrepresentation (including promissory fraud), civil RICO (18 U.S.C. §§ 1961–1968), intentional interference with prospective economic advantage, and/or federal civil-rights claims under 42 U.S.C. § 1981 and § 1985(3) where facts show intentional discrimination in the making or enforcement of contracts or a conspiracy to deprive equal protection. The anticipated discovery topics include: defendants' submission and evaluation practices; the role and pattern of high-profile minorities affiliates/intermediaries being used to target disadvantaged minority artists and routing creative materials to established prosperous corporations, without payment to the original disadvantaged artists; internal communications concerning compensation/credit policies; and the procurement, retention, and use of Plaintiff's Work and other disadvantaged artists' related materials.

112.    This chain of events is emblematic of a broader pattern and practice of targeting minority creators, inducing submission under false pretenses, and then systematically

30

misappropriating their works without compensation or credit. Defendants' conduct deprived Plaintiff of the right to make and enforce contracts on equal terms and may constitute actionable discrimination and conspiracy under 42 U.S.C. § 1981 and § 1985(3), as well as violations of copyright and contract law.

113.    Plaintiff further reserves the right to seek all remedies permitted by law and equity— including injunctive relief, restitution/disgorgement, punitive damages where available (e.g., for fraud, § 1981/§ 1985(3), or RICO), and fees/costs where authorized—without admitting or waiving any position herein. This reservation is made to preserve claims and remedies pending discovery and does not, at this time, assert such claims absent a good-faith factual predicate.

## VII.    DEMAND FOR JURY TRIAL

114.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

115.    Pursuant to the **Seventh Amendment** and **Fed. R. Civ. P. 38 and 39**, Plaintiff demands a trial by jury on all issues so triable in this action, including but not limited to liability and damages on the copyright and related state-law claims.

116.    In *Clonus Associates v. Dreamworks, LLC* Toberoff represented Robert Fiveson, producer and director of the indie film *Parts: The Clonus Horror*, in a copyright infringement action against Dream works for its 2005 blockbuster film the Island. The district court denied the studio's motion for summary judgment, writing in its decision that "the jury will have to decide whether the similarities are qualitatively substantial, and therefore actionable." The parties settled shortly thereafter on confidential terms and dismissed the case pursuant to a joint stipulation.

31

117. In another case *Marvin Gaye Estate V. Robin Thicke, et al. the* Jurors in Los Angeles decided that the 2013 single by Pharrell Williams and Robin Thicke breached the copyright of Gaye's 1977 hit "Got To Give It Up."

118. Therefore, Plaintiff requests that this jury demand be noted on the docket and reflected in any scheduling orders, and that the case be set for jury trial on all triable issues.

## VIII.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in its favor on all causes of action, including copyright infringement under the Copyright Act, breach of implied-in-fact contract, unfair competition, and breach of confidence , and grant the following relief:

a. Preliminary and permanent injunctive relief enjoining Defendants, their agents, affiliates, and all persons acting in concert with them, from reproducing, broadcasting, streaming, distributing, or otherwise exploiting the infringing works, including but not limited to *"The Oval," "Ruthless,"* and *"Jazzman's Blues,"* and any other works derived from Plaintiff's original literary work, novel, treatment, or storyline pitches;

b. Ordering the impoundment and, upon final judgment, destruction or other reasonable disposition of all infringing copies, masters, source files, marketing materials, and means of making same within Defendants' possession, custody, or control;

c. An accounting and full disgorgement of all profits, revenues, and other financial benefits derived by Defendants from the unauthorized use, reproduction,

32

adaptation, or exploitation of Plaintiff's work and storyline pitches, including all proceeds attributable to the infringing television series, films, and related media;

d. Actual damages sustained by Plaintiff as a result of Defendants' conduct, including but not limited to lost profits, lost business opportunities, and reputational harm, or, in the alternative, statutory damages as provided by law for willful copyright infringement;

e. Restitution and equitable relief for Defendants' unfair and unlawful business practices, including the return of all benefits unjustly obtained through the misappropriation and exploitation of Plaintiff's creative works and storyline pitches;

f. In the alternative to actual damages and profits, awarding statutory damages, including up to $150,000 per work for willful infringement;

g. Awarding restitution and other appropriate equitable relief under California Business & Professions Code § 17200 et seq.;

h. Awarding Plaintiff reasonable attorneys' fees and full costs pursuant to 17 U.S.C. § 505 and any other applicable law;

i. Attorneys' fees and costs incurred in prosecuting this action, as permitted by law;

j. Pre- and post-judgment interest as allowed by law on all monetary awards;

k. Such other and further relief as the Court deems just and proper, including any relief available under federal civil rights statutes and the Copyright Act.

1.   Plaintiff demands a trial by jury on all issues so triable, including all claims for copyright infringement under the Copyright Act, breach of implied-in-fact contract, unfair competition, and breach of confidence.

DATED this __5__ day of September, 2025.

Respectfully submitted,

GLOBAL ENTERPRISES & HOLDINGS INC.

_____ Date 9/5/2025

By: Shalina Ford, CEO

Authorized Officer of Plaintiff

(Not appearing personally)

Address: Global Enterprises & Holdings Inc.

c/o The Company Corporation

251 Little Falls Drive

Wilmington, DE 19808

Telephone:  (305) 330-2187 EXT. #800

Email: sfordgehinc@yahoo.com

# EXHIBIT INDEX

Exhibit A – Unsigned OWN contract allegedly reflecting unethical exploitive, unjust predatory terms and conditions sent by Harpo.

Exhibit B – Email from Ashley W., Harpo Creative Executive, stating they would review plaintiff's work, submitted by Plaintiff's attorney for production "consideration."

# EXHIBIT A

**Please read this Submission Agreement. By signing below you are agreeing to be bound by these terms**

**Terms**

1.  I am submitting to OWN: Oprah Winfrey Network (hereinafter referred to as "Company" which term shall also include Company's parent, subsidiary and affiliated companies and any related entities, employees, agents, licensees, successors, assigns of each of the foregoing, and all parties to whom Company may submit Materials) through Company's website certain concepts, premises, ideas, treatments, outlines, formats, marketing and promotional plans, proposals, literary material, video and/or musical compositions or other properties or other intellectual property of any kind controlled by me (hereinafter referred to as the "Material(s)").

2.  I understand that Company has adopted a policy of refusing to accept, consider or evaluate unsolicited Material from unrelated or unrepresented parties unless the person submitting such material has signed an agreement in a form substantially the same as this Submission Agreement ("Agreement").

    I specifically acknowledge that Company would refuse to accept, consider or otherwise evaluate any of the Material(s) in the absence of my acceptance of each and all of the provisions of this Agreement. I understand and agree that no confidential or fiduciary relationship is established by my submitting the Material(s) to Company, and review of the Material(s) by the Company occur on a non-confidential basis. I shall retain all rights to submit the Material(s) or similar material to persons or entities other than Company unless Company and I enter into a written agreement for Company's use of the Material(s), in which case all rights, title and interest in and to the Material(s), including the copyright, shall be deemed assigned to Company. I acknowledge and agree that Company is not obligated to review the Material(s), return any of the Material(s), or notify me if Company does not intend to use the Material(s).

3.  Company makes no promises, either explicit or implicit, relative to its acceptance of the Material(s); and unless Company and I enter into a written agreement for actual exploitation of the Material(s), there shall be no remuneration whatsoever associated with the Material(s), nor is there any promise of employment associated with my submission of the Material(s), either during Company's development of such Material(s) (if any) or during actual production should such Material(s) develop into a bona fide television program, motion picture, or other work. I agree that no contract or obligation of any kind is assumed by Company, or may be implied against Company, by reason of Company's review of the Material(s) and/or any discussions or negotiations Company may have concerning the Material(s). Specifically, I understand that neither my submission of the Material, nor Company's review of the Material(s), constitutes or creates an implied-in-fact or implied-in-law contract, even if an industry custom to the contrary exists.

4.  I represent and warrant that: (a) I am the sole owner, creator and author of the Material(s), that the Material(s) is my own original work, and that I have the exclusive right and authority to submit/assign/sell/transfer the same to Company upon the terms and conditions stated herein, including with respect to the title of the Material(s) (if any); (b) the Material(s) was created and written by me without any suggestion or request from Company or any other third party that I write or create the Material(s); (c) there are no third parties having any proprietary or other interest in the Material(s); and (d) I have the full right and authority to enter into this Agreement for myself and on behalf of any organization with a proprietary interest in the Material(s). I agree to indemnify Company from and against any third party liabilities, losses, claims, demands, damages, judgments, awards, costs (including reasonable attorney's fees and expert witness fees), suits or expenses that may be incurred by Company at any time in connection with the Material(s), or any use thereof, including but limited to those arising in connection with any breach or alleged breach of the representations and warranties in this Agreement.

5.  I agree that Company shall have the right to use any portion of the Material(s), without any liability or obligation to me, that (a) is not legally protectable under the United States laws of copyright, or (b) is not sufficiently "novel", "concrete" or "original" as those terms are defined by the laws of those jurisdictions that recognize novelty as an element of an implied contract or breach of confidence claim, or (c) is similar to or contains significant elements of a concept Company already had under consideration or in development at the time of my submission, or (d) has been made public by anyone at the time of my submission, or (e) is in the public domain, or (f) would be freely usable by a third person if it had not been accepted as a submission. Nothing contained in this Agreement nor the fact of my submission of the

Material(s) to Company shall be deemed to place Company (or any person or entity to whom Company may show the Material(s)) in any different position than any member of the general public with respect to portions of the Material(s) that are not legally protectable as set forth above by reason of my submission of the Material(s) to Company.

6. I agree and acknowledge that Company has access to and/or may have created or may create in the future concepts, premises, ideas, treatments, outlines, formats, marketing and promotional plans, proposals, literary material, video and/or musical compositions or other properties which may be similar or identical to the Material(s) in theme, idea, plot, structure, format and/or other respects. I agree that I will not be entitled to any compensation because of, and hereby waive any and all claims related to, the use of any such similar or identical material which may have been independently created by Company or any other individual or entity or that may have come to Company from any other independent source. I agree that, in any dispute arising from any alleged use of the Material(s), I will bear the burden of proving that Company did not independently create the alleged similar materials or ideas or obtain them from a source other than me. I agree and acknowledge that no presumption of inference of copying or use shall arise or be asserted by virtue of (a) any similarity between Company's work and the Material(s); or (b) the fact that I submitted the Material(s) to Company and that Company had access to it.

7. In the event Company commercially exploits the Material(s), I grant to Company the worldwide perpetual right to use and license others to use my name, photograph, likeness and biography in marketing, advertising, publishing or otherwise exploiting the Material(s) or any portion thereof in any medium including, without limitation, any television program, pilot or series produced from or utilizing the Material(s). Neither I nor any of my representatives shall issue or authorize the issuance of any publicity with respect to the Material(s) or other matters referred to herein.

8. In the event of any dispute concerning any alleged use of the Material(s) (including a dispute about whether Company has used legally protectable portions thereof or infringes any copyright or trademark or any other rights in the Material(s)), or any other dispute arising out of or in connection with the Material(s) or with reference to this Agreement, its validity, construction, performance, non-performance, operation, breach, continuance or termination, as well as any dispute as to the arbitrability of any such controversy or claim, such dispute shall be finally resolved by mandatory arbitration between us. In this regard, I further agree and acknowledge that:

   a. The arbitration shall be final and binding on the parties, and that judgment thereon may be entered in any court of competent jurisdiction and in connection therewith, I hereby submit to the exclusive jurisdiction of the state and federal courts located in Los Angeles, California for entry of such arbitration judgment only;

   b. The arbitration shall be initiated and conducted according to the JAMS Streamlined or the JAMS Comprehensive Arbitration Rules and Procedures (as applicable), except as modified herein, including the Optional Appeal Procedure, at the Los Angeles office of JAMS, or its successor in effect at the time the request for arbitration is made (the "Arbitration Rules"). The arbitration shall be conducted in Los Angeles County before a single neutral arbitrator with experience in the entertainment industry appointed in accordance with the Arbitration Rules. The arbitrator shall follow California law and the California Rules of Evidence in adjudicating the dispute. The parties shall be responsible for payment of all of their own costs, fees and expenses, including attorneys' fees, of arbitrating any dispute;

   c. Company and I are waiving our right to seek remedies in court, including the right to a jury trial;

   d. If it is determined by the Arbitrator that Company improperly used the Material(s) in violation of the terms of this Agreement, I agree that the sole remedy that can be awarded in any Arbitration against Company or its affiliated companies or employees shall be a monetary award consistent with reasonable compensation for Company's use of the Material(s), and I expressly waive any right to any other form of relief, including but not limited to injunctive relief, any form of consequential or punitive damages and/or any alternate calculation of damages;

   e. In no event shall any award be based in any part upon advertising revenues received by Company in connection with the Material(s) and/or arising from or relating to any exploitation, development, distribution or other use of the Material(s);

 f. By accepting this agreement I acknowledge that I am agreeing in advance to arbitrate any controversies or claims which may arise with Company.

9. Except as otherwise provided in this Agreement, I hereby release Company of and from any and all claims, demands and liabilities of every kind whatsoever, known or unknown, that may arise in relation to the Material(s) or by reason of any claim now or hereafter made by me that Company has used or appropriated the Material(s).

10. Company may transfer, assign or license to any person, firm or corporation, its rights and obligations hereunder, in whole or in part, without my consent.  I shall have no right to assign or transfer my rights and obligations hereunder.  Any purported transfer, assignment or license in violation of the forgoing shall be void and have no effect.

11. I have retained at least one copy of the Material(s), and I hereby release Company of and from any and all liability for loss of, or damage to, the copies of the Material(s) submitted to Company hereunder.

12. I am executing this Agreement voluntarily, without coercion or undue influence from any source. This Agreement states our entire understanding and agreement with reference to this subject matter hereof and replaces any other prior agreements or understandings between the parties hereto. I have read and understand this Agreement and no oral representations of any kind have been made to me.  Any modification or waiver of any of the provisions of this Agreement must be in writing and signed by both the Company and I.

13. I agree, upon request from Company, to execute, verify, acknowledge and deliver to Company any and all other documents consistent herewith which Company may reasonably deem necessary or advisable to evidence, establish, maintain, defend and effectuate any of Company's rights under this Agreement and to the Material(s).

14. Should any provision or part of any provision of this Agreement be deemed void or unenforceable, such provision or part thereof shall be deemed omitted, and this Agreement with such provision or part thereof omitted shall remain in full force and effect.  This Agreement shall at all times be construed so as to carry out the purposes hereof and shall be governed by the laws of the State of California, without regard to its conflict of laws principles.

By signing below. I represent and warrant that I have legal capacity to enter into this agreement, and either (a) am accepting the terms of this agreement on my own behalf or (b) am an authorized representative of an organization and am accepting the terms of this agreement on behalf of such organization.


_____
Print Name


_____
Signature


_____
Date

# EXHIBIT B

Ashley

**Ashley W██████** Creative Executive | Harpo Films
Direct: 323.██████

---

**From:** Joshua E██████ <j██████@e██████management.com>
**Date:** Friday, March 1, 2019 at 11:06 AM
**To:** Ashley W██████<aw██████@harpo.com>
**Cc:** "██████@██holdingsinc.com" <s██████@██holdingsinc.com>
**Subject:** Fwd: Fw: The Senator's Wife- TV Series Treatment by S██████████████-Ford (December 23, 2002)

Dear Ashley,

Attached and below please find the treatment for the television series currently entitled THE SENATOR'S WIFE being submitted on behalf of my client Shalina ██████. As per my client's conversation with Carla G██████ we are submitting this treatment to you as consideration for development at the OWN Network and other affiliated channels. I have also included a logline below for your perusal. I look forward to hearing from you. Please do not  hesitate to call anytime should you have any questions or concerns.

## **LOGLINE**

After the trauma of watching her husband and first son die during the Tulsa Race Riot of 1921 in Oklahoma Michelle ██████Ford is devastated. A very light skinned Black woman, Michelle, walks out of her body and her former life as a member of the "privileged few" elite Blacks and in walks Renee who pretends she is White. Renee vows to change the world from a new vantage point as a White woman in the "Game" as her grandfather's secret organization called the world we live in. Michelle/ Renee succeeds in changing the world by becoming an activist and raising her daughter Estelle to become a lobbyist and a powerful senator's wife. However Estelle must eventually choose between the power of being a senator's wife and the true love she found with Michael Hagar, her abusive husband's Black secret service agent.

Best,

Joshua A E██████ Esq.
Attorney At Law

Re: The Senator's Wife- TV Series Treatment by Shalina ▓▓▓▓▓▓-Ford (December 23, 2002)

From:    Ashley Wh▓▓▓▓▓▓r@harpo.com)

To:      sr▓▓▓▓holdingsinc.com

Date:    Tuesday, March 12, 2019 at 04:42 PM GMT-5

Hi Shalina,

Please give us some time to review and will circle back.

Thanks!

Ashley

**Ashley W▓▓▓▓** | Creative Executive | Harpo Films
Direct: 323.▓▓▓▓

---

**From:** "S.▓▓▓▓▓R@ga holdingsinc.com>
**Reply-To:** "S.▓▓▓▓@ga holdingsinc.com>
**Date:** Monday, March 11, 2019 at 12:21 PM
**To:** Ashley W▓▓▓▓@harpo.com>, Carla G▓▓▓▓@harpo.com>
**Subject:** Fw: Fwd: Fw: The Senator's Wife- TV Series Treatment by Shalina Renee Murrell-Ford (December 23, 2002)

Hi Ashley,

I just wanted to confirm you received my treatment submission. Do you have a few minutes to discuss the treatment? Please give me a couple of times you are free.

Thanks,

Renee

----- Forwarded Message -----

**From:** S.R. m <smurrell@geholdingsinc.com>

**To:** Ashley W███████████@harpo.com>; Joshua E███████████@e█████management.com>; Carla
G████████████@harpo.com>

**Sent:** Friday, April 12, 2019 at 07:01:29 PM GMT-5

**Subject:** Re: The Senator's Wife- TV Series Treatment by Shalina Renee Murrell-Ford (December 23, 2002)

Hello Ashley and Carla,

I appreciate your response. Many people have stated they have never seen anything like my very original themes that are in my novel and treatment from my own life and family and that they would be a good fit with OWN. If you change your mind in the near future please let me know as I would prefer to work with OWN over the other network possibilities.

Thanks,
Shalina ████████████-Ford
President
G.██ Holdings Inc.
202-549-1402

On Friday, April 12, 2019 4:15 PM, Ashley W███████████@harpo.com> wrote:

Hello,

Thank you for thinking of us. Shalina has provided a very extensive and thought out treatment. Unfortunately, some of the themes present overlap with other development we have on our slate so it's not right for us at this time.

All the best,

9/4/2025

Clerk of Court
U.S. District Court
Central District of California – Western Division
255 East Temple Street, Suite 180
Los Angeles, CA 90012


Re: Filing of Complaint and Motions – Request for PACER Upload and Email Notification

Dear Clerk:
Enclosed please find the following documents for filing as a new civil action:

1. Original Complaint
2. Civil Cover Sheet (CV-71)
3. Summons (AO 440) for each Defendant
4. Motion to Represent Corporation
5. Motion for Early ADR / Mediation Before Service
6. Motion for Extension of Time to Obtain Counsel
7. Certificate and Notice of Interested Parties (CV-30)

Also enclosed is the filing fee of $405 (check or money order made payable to "Clerk, U.S. District Court").
Please:
- Docket the Complaint and motions, issue the Summons, and upload all filed documents to PACER/CM-ECF.
- Send any deficiency notices or communications regarding this filing to my email address: sfordgehinc@gmail.com
- I do not require a mailed conformed copy and will obtain the filed documents electronically through PACER.
Thank you for your assistance.

Respectfully submitted,

_Shalina Ford_  9/5/2025
By: Shalina Ford, CEO
Global Enterprises & Holdings Inc.

Authorized Officer of Plaintiff
(Not appearing personally)



DHL

DHL Express

ENVELOPE